Will you call the next case please? Case number 312-0916, consolidated with 313-0063, Gardner Fire Protection District Appellee by Richard Porter v. Gardner Volunteer Fire Department Appellant by Megan Preston. Ms. Preston. Good morning, Your Honors. May it please the Court, my name is Megan Preston. I represent the Gardner Volunteer Fire Department. This is related to a dispute with the Gardner Fire Protection District. Just a summary of the facts relevant to the appeal. The Gardner Volunteer Fire Department is an Illinois not-for-profit corporation. It was incorporated in 1958 to provide fire protection and ambulance services in the Gardner area. In 1967, the Gardner Fire Protection District is formed. And in 1997, the district and the department entered into an agreement for the department to provide fire protection and ambulance services within the district. Relative to the contract, the Gardner Volunteer Fire Department was also permitted to provide ambulance services or agreed to provide ambulance services outside of the district in exchange for payment fees for its services from those customers. Otherwise, it was paid by the district for the services it provided by way of TIP funds or tax revenues. In 2002, the agreement was amended to distinguish between two different types of terminations of the contract. One type was termination without cause. The other type was termination for cause. If the agreement was terminated without cause, then the assets of the fire department would remain with the fire department and it could continue to operate as an not-for-profit corporation. On the other hand, if the contract was terminated for cause under a set of listed purposes stated in the amendment, then the assets of the fire department would be transferred to the fire protection district. In 2010, disputes began to arise between the department and the district, and the department filed the first of four actions that have been filed between the parties in this case. The complaint was a mandamus complaint in Grenby County related to the failure of the district to pay certain fees that it had to the department previously. The way the agreement had worked over time was that the district would simply give the tax revenues and TIP funds to the department, and the department would provide the services. Prior to 2010, the district began requesting more of an accounting, and the parties entered into a dispute and the department asked the court to decide. The court issued a mandamus order in early 2011 stating that the TIP funds should be paid over to the department, but that the district had discretion over the tax revenues, and if it determined that it needed those funds for operating expenses or some other expenses, it could decline to pay those funds over to the department. There was a declaratory judgment action filed in 2011 by the district that ended relatively quickly. In April of 2011, the district sent a notice to the department to terminate the agreement without cause. It was a six month notice requirement such that the agreement would have terminated in November of 2011. In September of 2011, the department filed a complaint against the district, asking the court to order that the agreement cannot be terminated due to some loans pending, and also asking that the district be ordered to pay over certain tax revenues over which it believed the district had not exercised discretion to withhold. Approximately a month later, in October of 2011, the district then files a resolution agreeing to terminate the agreement for cause, and sends notice of the for cause termination to the department. Immediately thereafter, the district files its complaint, asking the court to find that the agreement has been terminated for cause, and asking the court to give the assets of the department to the district. Pursuant to the agreement, the department was entitled to a reconsideration hearing in front of the district's trustees. They immediately requested that hearing, and that was held on October 25th. During that hearing, the trustees asked various questions, many of which were not in any way related to the spending of funds or the termination of the agreement for cause. The district upheld its termination for cause based on its belief that the department had misappropriated certain funds, misspent monies. In June of 2012, the court granted a replevant order in favor of the district, and then ultimately granted summary judgment in favor of the district on both of the complaints. There are four questions that the department has raised on appeal. The first is, can the department, as a not-for-profit corporation, misappropriate funds by spending monies for political purposes? The court found that the department had used monies in relation to an election contest of certain trustee officials. So the first question is whether the department is limited in the way that it can spend its monies. The second question is whether, regardless of whether the agreement is terminated for cause or without cause, if the doctrine of side-press should be applied to the department's assets such that those assets should be transferred to the district because the department is a charitable trust which can no longer operate as a charity. The third question is whether the district operated with good faith and fair dealing when it terminated the agreement for cause. And the fourth question is whether the district exercised its discretion not to pay certain tax revenues over to the department prior to the time that the agreement was terminated. We did raise an issue regarding whether an accounting was appropriate. In this case, the district in its response brief admitted that that is now a moot point because the district does currently have all of the assets of the department. Regarding the misappropriation issue, we believe that the department cannot misappropriate funds by spending those monies for political purposes. Let me ask you this because the relationship between the fire department and the fire district, I suppose there's one argument that the fire department is separately incorporated, not for profit. Correct. One analogy might be, although I don't think it works, is if a village or a city or a municipal body of some kind contracts with a garbage disposal company to pick up, and that's a public service, garbage disposal, and they pay them obviously with public monies to do that. But then in that case, what the waste management corporation does with that money once they get it seems to be, I don't think they can misappropriate money. So what is it about the relationship between the fire department and the fire district that allows the fire department to misappropriate money that's been paid to it by the fire district? I think your honor is correct. I don't believe that the department can misappropriate funds where it's being paid monies pursuant to a contract to provide certain services. The only example I can think of that would possibly be a misappropriation, as it is a term of the agreement, would be if the department spent all of the money and stopped providing services because it didn't have the money to fuel the fire truck or something along those lines. There are no facts in this case that indicate that the department at any time lacked funds needed to provide any of the services required. So trying to figure out what misappropriation means in the terms of this agreement seems a little troublesome in trying to figure out what that means. I grew up in a small town where we had a volunteer fire department and we've got generations and fathers and sons for generations running a volunteer fire department. In addition I suppose to tax money, fundraisers and stuff, I think everybody thought when they were donating to the fire department that they were giving to basically a government run out organization. I don't know, but I think, wouldn't you suppose when your client has a fundraiser that people think that they're really donating to the public for the public good and not for the benefit of members of the fire department? Yes, that's probably true, your honor. Now that is a source of funds that this department has. Fundraisers? Yes. Yes, that's correct. Is it possible that the district in contracting, this might be a better question for the opposing counsel, can actually take public tax money and specifically delineate what it can and cannot be used for? I would presume that it could. To give no absolute discretion to the chief and the volunteers to buy weight lifting equipment? I would presume that it could within the contract between the parties. I don't know. And if that were part of that contract and there were money spent not for those line items, that that would be misappropriation, right? I would think that that would at least be a breach of the contract, sure. Sure, but it would also be misappropriation of public funds, wouldn't it? I'm not sure that it would be. What's misappropriation? I think that's a good question. I think that's a question raised by the district. The misappropriation is listed within the contract with fraud. And I also had a difficult time coming up with examples of the department committing fraud or a felony. But I think that misappropriation could be found if the department was spending all of the money and not able to provide the contracted services. I think in the context. Okay. But you're saying it would at least be breach of contract and you wouldn't be here if those were delineated tax monies. This goes for a tanker, can only be spent for a tanker, can only be spent for fuel in a department vehicle? Correct. But if someone's out there at the tank gassing up their car with an SUV, that would be theft, wouldn't it? Sure. If the agreement had provided that certain things must be done with the money, then I would agree with you that it's used for different things. We don't have that here. No, we do not have that here. And I guess to boil that issue down is once the district hands the money to the department, is it still public money? And I do not believe that it is public money. And the trial court in its replevant order indicated that the department does not hold the funds paid to it by the district as a trust. Instead, it's payments for services provided under the contract. I think that's an important distinction. Okay. Thank you. To address the Cypress issue quickly, under the Decatur case, I don't believe that the department is a charitable trust. The district will likely bring up the Riverton Fire Department case, in which the court did find that the department in that case was a charitable trust. There are a couple of distinctions with the department in this case, including that it provides other services outside of fire department, firefighting. And it does derive a significant amount of its funds from ambulance services. About 40%, 45% of its funds were services paid, not under the contract directly with the district, but by people to whom it was providing fire protection services. Even if the department here is a charitable trust, again, as opposed to the Riverton Fire Department case, where the fire department specifically stated that it intended to stop providing its fire protection services, which were its sole stated services it would provide, and that it was going to liquidate its assets. We don't have that in this case. The department charter lists a number of other services it provides, including the ambulance services, some educational services, and the like, and has never indicated that it intends to liquidate the assets and stop providing those other stated services. Well, because this relationship is a little confusing, let me ask you another question. If, in fact, the contract were terminated, not for cause, everybody agree we're going to terminate this contract, okay, so now the fire department has a number of assets, you know, fire trucks and turn out gear, all the stuff that goes along with it. Could the members of the fire department say, you know what, we're tired of doing this, it's dangerous, it's taking too much time out of our lives, yadda, yadda, yadda, we're done. Could they liquidate the assets and what would happen to them? You know, could they sell all the fire trucks, divvy up the money, and go home? I certainly think that's a good question, but I don't specifically know the answer to what would happen in that case. In that case, perhaps there would be a reanalysis under the Riverton case as to whether those assets should then be transferred to the district under Cypress, but we don't have that in this case, as the department has indicated that it wants to still provide ambulance services or contract with another district. Well, who owns the corporation? Who owns the corporation? It's a not-for-profit, so there are various members, the various volunteers are members of the corporation. They may be members, are they owners? I mean, this is getting outside of it. I mean, following up on Justice Smith's question, I mean, you're talking like a liquidation of a non-profit? Correct. Okay. And the only reason I ask is to try to get my brain around the relationship between the fire district and the fire department, because it's really neither fish nor fowl. I mean, it's hard to equate it with some other supplier of services, for example, a waste management company, although I guess they're not, those are for-profit corporations. Sure. And you could contract, the district could contract with a for-profit? Yes, it could. It absolutely could. Or another municipality. True. And many districts do that, they don't have their own. Yes, that is correct. Are there any other questions? No. Thank you. Thank you, Ms. Baxter. Mr. Porter? May it please the Court. Counsel. My name is Rick Porter, and I represent the Fire Protection District. The summary judgment granted to my client should be affirmed because it exercised its contractual discretion without being arbitrary, capricious, nor acting in bad faith. Alternatively, the Doctrine of Side Prey required that the assets of the department be turned over to my client, the district, because the department was no longer able to meet its primary charitable purpose, which was providing fire protection to the citizens of Gardner, Illinois. Once that contract was terminated, the Doctrine of Side Prey requires that the assets be turned over and the purposes of the charity be protected by the closest means possible, and the way that that's accomplished under the Riverton case is by turning the assets over to the Fire Protection District. What about the ambulance services? Those are clearly not fire protection services. That is a purpose, but it is not the primary purpose. One thing that we need to remember is that that addendum that was executed explicitly required and provided that the fire department has been and always will be a not-for-profit volunteer fire department whose only reason, this is quoting now, for acquiring assets is to afford the residents of the Fire Protection District fire department, ambulance, and emergency medical services. It was that language that my client relied upon to turn over its TIF funds and its public funds to buy the fire trucks, the real estate, the million-dollar building, et cetera. They were holding all of that in public trust based on the terms of that contract. The Riverton case explicitly held that a corporation is a charitable trust if its primary use of property is for charitable purposes. There is no doubt that the primary purpose and the primary use of the assets here were for fire protection. There's one ambulance. There's a half a dozen trucks. There's a fire department building that's used. The primary purpose here was fire protection. They did also have an ambulance and provide emergency services under the authority that had been granted to the Fire Protection District and contracted to the department. That's where all of that emanated from. It's one of the profit makers, though, isn't it? It is. It is not the primary profit maker. You have 45%. What we found was that over 60% or 55% was emanating from public funds, TIF funds and tax revenue. We don't know exactly what the other 45% is. I presume that is primarily ambulance. The question, though, is what is the main... This is item number three. In the Riverton case, they used a six-part test that came out of the Cater case. The third part of that test was that the funds derived mainly from public and private chairing. We've got an omission here. Mainly, the funds were from TIF funds and tax revenues. It's clear that the Riverton case applies. We don't even have to get to Riverton because we have a contract at issue. The department continually mischaracterizes the issue, and they did it again today, of suggesting that this court can de novo try to make a determination whether or not there was a misappropriation. That isn't the question. The question is whether or not my client, who had exclusive or had the vested contractual discretion to determine if there was a misappropriation, abused its discretion by being arbitrary, capricious, using bad faith, or not following a reasonable expectation of the parties. That's the issue. So you're saying we don't have to get out of the contract to talk about what misappropriation is. Correct. That it can be determined within the terms of contract and the authority is given to the district. Well, what the contract provided were A through H, various reasons that termination of a cause could occur. We're only talking right now about A, which happened to be misappropriation, commission of a felony, and fraud. There's a whole bunch of others, one of which is failure to maintain gross malfeasance, it's E, in the maintenance of the property, of the building and the vehicles. Why in the world would that be in there if they could use their assets in any way that they saw fit once we paid for them? They could not fail or use gross malfeasance in maintaining those assets. If they did, we terminate the cause and they are returned or transferred to the district in total. Likewise, counsel now says, well, I can't fathom what misappropriation is. Now, why are they returned to the district in total? Under the terms of the contract? Correct. The terms of the contract provide, if there's a termination for cause, all of the assets of the department are transferred to the district. That's because all the assets were for the public trust. I mean, we have discussed the fact that they were maybe arguably assets of the department, but you're saying under the terms of the contract, if there's cause, part of the contract is you relinquish. Correct. It's A through H, not just A. But let me ask you this. If the property has been held by the department of the public trust, what's the difference what the reason, whether it's for cause or not for cause? It's held in public trust. It still goes back to the public, doesn't it? That's not what the contract says, but under the law of Cypress and— I would agree, Your Honor. If indeed the contract is terminated at all, the doctrine of Cypress would say those assets should be returned to the district. You need to continue that charitable purpose as much as possible. They cannot provide fire protection in Gardner anymore. The only authority for that is through our statutory authority. Well, they could on private contracts. No, not in Gardner. In Gardner, the fire protection district has sole authority to provide for fire protection in Gardner. The Gardner Fire Department cannot provide fire protection in Gardner. So we don't have competition in Gardner on fire protection? Not on fire protection. That's the whole point of the Fire District Protection Act, is that you don't have the fire department showing up and then sending bills. How much—and the misappropriation. How much did they misappropriate, do you say you? Well, quite a bit. There is misappropriation for divorce transcript. How much was that? That was $19. There was $8,000 in attorney's fees spent to oppose a trustee that was running for the fire protection district. It was $47,000 for a credit card. Well, could a reasonable person argue that raising an $8 or $9 purchase of a transcript was not, as a reason to terminate the contract, was not in good faith? It wasn't the only reason. There were five stated reasons. The first one was the divorce transcript proceeding. The second was $8,000 spent on attorneys to try to oppose a trustee that also held a position as a sheriff. The third was $2,000 spent on bar tabs and restaurant bills. The fourth was another approximate $2,000 for checks that had a blank payee. And the fifth was $47,000 for a credit card bill that they refused to provide an accounting for. And remember, my client can only assess taxes for purpose of which it's authorized to collect and levy taxes. And the department was refusing to account for these amounts. They were all paid for out of checks from an account marked public funds by which we directly deposited TIF and tax revenues. That's where these checks were coming from, if I may. One of those, they asked for reconsideration. And a reconsideration hearing or meeting was held a couple weeks later. At that meeting, they provided some evidence concerning those blank payees, the fourth reason. And that fourth reason was vacated. So with the contract required, the reasonable expectation was that you would use your assets only for the purposes by which you stated you'd use them, which was to afford fire protection district. Your failure to do so or your failure to maintain those assets would be a misappropriation. And you would have a right to seek reconsideration if you got that and the district still found that you misappropriated. The expectation was all the assets would be turned over. One language hasn't come up, if I may, real quick. Well, wait a minute. No, my turn. What if, what, what about, was there money deposited in that account that was not TIF money or tax money? In other words, money that the fire department raised through whatever. That is the testimony. That indeed, additional funds, it was actually the emergency squad account at Standard Bank. The monies that were TIF monies and tax monies went into that account. And additional, in addition, ambulance fees went into that account without any, they commingled. Which actually, in and of itself, is a violation of the Fire District Protection Act, which requires the not-for-profit entity you contract with to perform an annual audit. Section 11A of that requires that they, or identifies that they should segregate accounts if they have separate accounts. They didn't do that. And so they used accounts that were public funds. So you wouldn't be here. I mean, I'm from even a smaller town than Justice Schmidt. And we have annual chicken dinners, et cetera, for the volunteer fire department. You're saying you would not be here if they had segregated accounts where, for example, funeral donations, memorials, chicken dinners. I don't have a crystal ball, but I can tell you that we had evidence. This wasn't arbitrary. The evidence was the checks that came out of the funds that we were depositing to. That was, and those checks in the balance sheets, it showed they were using the public fund. As a matter of fact, they were marked public funds for several years by the bank. They had title, nomenclature, public funds. And they were using those checks, those canceled checks, with the evidence that my client utilized in order to terminate the cause. We would not have had that situation had they segregated those accounts. It would have been a much different question. But I will point out that the purpose of the addendum, this is in the wherefore, explicitly stated that the department was, I'm sorry, that the purpose of the addendum was to address, quote, the assets and equipment being acquired by the Gardner Volunteer Fire Department with payments received from the Fire Protection District pursuant to this contract. That's in the wherefore. The wherefore then says our only purpose, the department's only purpose for acquiring those assets is to provide fire, provide the Fire Protection District, Fire Department, and its emergency medical services. Their assertion now that they can meet fraternally and that their charter, somehow the language they can meet fraternally, destroys the fact that their purpose was to provide fire protection and somehow means that they can use their monies in any way they see fit, ignores the plain language of the statute. I'm sorry, plain language of the contract. The contract said the whole purpose of it was to determine what's going to happen with these assets you're buying with public money. In this case, the cause was misappropriation, correct? Correct. The enumerated reasons, and then you withdrew one after the re-hearing. Correct. And with regard to the misappropriation, there was never very much clarity to the $47,000 of the credit card. Actually, one, they refused before the notice went out of cause to provide an accounting concerning that $47,000. At the reconsideration hearing, they did not provide it. They were actually given an additional time period afterwards by which to do so. They elected not to, and it was reconfirmed on that grounds as well. So there's never been a clarification on $47,000 where the credit card was. Well, has there never been? I can't say that. There was not before the termination of the cause. So on this record, do we have any greater clarity? No, we don't. What we do have clarity of is we know what the $8,000 was spent for, and we know it was for political purposes, which is something we haven't talked about today. That's another one of the enumerated reasons. Right. Once the district found out that their monies were being used for improper purposes, purposes that we could not use them, not only were we allowed to terminate for cause, use our discretion, which was used without it being arbitrary, they were required to. It was incumbent at that point upon the Fire Protection District to terminate for cause because we found out the contractor wasn't doing what it said it would do. It was only supposed to be acquiring assets to afford fire protection or fire department, ambulance, and emergency medical services to our district. It wasn't doing that. It was using them for a political purpose we could never do. And that harkens back to Article 8 of the Illinois Constitution, which provides that public funds can only be used for public purposes. The statutory obligations that you refer to that the district has to comply with, did the contract outline those requirements with your contract with the fire department? I'm sorry, Judge, I lost my train of thought. You have certain statutory obligations about how the money is spent and what to do and so forth, and you've stated that in part in your argument. Did the contract mirror those obligations, all the obligations you've referred to? The contract explicitly provided that the only reason for acquiring assets was to afford the residents of the Fire Protection District, fire department, ambulance, and emergency medical services. So, yes, the contract outlined that's the reason, and at one point they were just turning over, and there's a question of propriety of that, turning over the TIF monies to the tax revenues. Eventually we started requiring an accounting, but giving that money was with the understanding and the agreement that they were only being acquired to provide fire protection, emergency ambulance services. Once we found out that was no longer happening, that's what misappropriation is. That's why that language was there. All right, but you said a minute ago that we were required to do this, that they were public funds. Well, once a public body pays money to a non-public, non-governmental organization, is it still public money? Well, it all depends on the fact scenario. In this case, we have a contract which explicitly provided what the monies were supposed to be used for. So, in my case, it is still public money. Could a reasonable person argue there's a question of fact is what money was being used for that, whether it was the money you gave them or whether it was the money from the chicken fries? There is no question of fact. The facts are it was commingled, and everybody acknowledges that. You can take 100 depositions on that topic, and you're never going to get any more information on that issue. So when they commingled it, does that make it all public money? What we know is that there was misappropriation occurring. Is it all public money? They were misappropriating funds. They were not doing what they contracted to do. And we only gave them the money with the understanding that their only reason for taking the money, the assets, was that they provide fire protection. And so that is a misappropriation. Did they provide fire protection? They did that, but they used the funds for other purposes as well. And that's the problem. I think Justice Smith's question is use the funds. Which funds? And you're saying we can't determine which ones. Because they failed to follow the Fire District Protection Act, which would have required them to segregate those funds, we can't determine that. But we do know that that's where all our deposits went, into that public fund account that was then used. And that was the basis of our misappropriation. It wasn't arbitrary. The question there is, is there any rationale? It's a very high deference standard to be paid to the entity that has contractual discretion. And that's the Greer case. To educate us, the fire department, which has been organized, registered with Secretary of State, nonprofit corporation, must follow the Fire Protection Act requirements? It has to, when it contracts as a not-for-profit, to receive fire district funds. Yes, there's a section in there that requires a budget and annual audit from that not-for-profit as well. And segregation of funds from private donations versus public. Right. And an annual accounting audit. Correct, and that's that section 11A of the act. So they are in violation of that act, is what you're implying. Correct. And we would be in violation of that act once we realize that public monies are being used for an improper purpose. If we take no action, we're in violation of the Constitution, we're in violation of that act. We would not be protecting the public assets that we've been put in trust of. It would be completely a dereliction of our duties to have allowed that to continue. So who's putting out fires in Gardner? The Fire Protection District now has its own department. And so it is operating and has been since we took over those assets. We have our own chief. They're in the fire. We were in the building. We have the vehicles. We have the employees. We've been operating the ambulance. It's been going well. So it's no longer a volunteer. I believe there are volunteers involved as well. I'm not sure of that fact, Your Honor. I know that the chief is a paid employee, as was the chief of the department. Unless you have any other questions. And we haven't touched much on the Riverton case. And I don't believe that you can distinguish Riverton in any way from these set of facts. In that case, a not-for-profit, a contract was terminated. The not-for-profit, the district, the not-for-profit, one of the assets, just like this, argued that there are assets. And the court held no. A not-for-profit fire department is a charitable trust, exactly what we have here. And once your primary purpose ended, those assets have to be turned over to try to protect that charitable interest as close as possible. And that's what's happened here by giving the assets to the district. You cannot distinguish Riverton from this case. You're saying you can proceed under the contract terms. I can proceed under contract or alternatively under Riverton, which is exactly what the trial court did. He did both. For those reasons, the summary judgment should be affirmed. Thank you very much for your time. Okay, thank you. Ms. Preston, some rebuttal? Yes, briefly. Thank you. Regarding whether the district acted arbitrarily and capriciously in regards to the termination of the contract for cause, the court said that the reasonable basis that the district used to confirm the termination of the agreement for cause was the misappropriation based only on public funds. It did not uphold the other issues raised by the district in terminating the agreement, such as the credit card payment. I don't know what the answer to your Honor's question was regarding the explanation of the credit card payments is. However, in looking at the political purposes used, I think there are two important issues. One is the department limited in whether it can use its funds for political purposes, and I don't believe it is. I believe it can use its funds for political purposes if it wants to. And two, whether it was unreasonable for it to do so because it knew whether or not it could use those funds for political purposes. I don't believe anything in the contract specifically says that the department is limited in any way by the Fire Protection District Act. There is a requirement regarding accounting required by the department, but it doesn't specifically direct the department that it has to comply in some way with the Fire Department Act. I don't believe that's actually in the contract. As to whether the district... It's in the contract. In the contract. What about the statute? There's a statute. Correct. There is a statute. I don't think it specifically applies to the department. I don't think every provision of that act applies to the department. The act does state that if a fire district contracts with another entity to provide services, there are certain accounting requirements. But I don't think that that limits any entity such as Waste Management from spending its funds for political purposes as a government entity would be limited from doing. Well, apparently we have a department that didn't do any of that. I'm sorry. I think closing counsel said if there were segregated funds, there may not be a cause. But there was no audit. There was no segregation of funds. And so it's rather hard to defend, isn't it? Sure. Do I wish that funds had been segregated? Absolutely, I wish the funds had been segregated. But I think the facts have shown that there were sufficient funds from other venues, other services provided, such as the ambulance services, that there were sufficient monies in the accounts for the department to spend.  I think once the tax funds are paid to the department, those funds are no longer public funds. Even if they are, I'm not sure the other monies are transformed into public funds once they're put into the same account. What about the clarity of the credit card, $47,000 of that? Yeah, I don't know the answer to that question, Your Honor, whether it was ever clarified or not. The trial court did not uphold that reason as one of the reasonable bases for the district to terminate the agreement, so I'm not sure I can answer that question. Just quickly to address the Remerton case again, because the facts are admittedly very similar in this case. The court there specifically found that the department's sole long-standing purpose was to provide fire protection services, and that the fire department indicated it no longer intended to provide services, and that it did plan to liquidate and convert those assets for non-protection services. So again, we have other stated purposes listed in our charter and in our actions, and actually in the contract, where we say in the contract we're going to provide services outside of the district as well. What about the amendment to the contract? The amendment to the contract did not change that term of the agreement, so it was still permitted to provide services outside of the district. You're talking assets. That's where your bottom line is. Whose assets are they? I'm sorry, I don't understand your question. My question was, I thought your whole line of argument was the department can keep these assets. Correct. Now I'm asking, was the contract amended that affected that? The contract... Closing counsel says we get those assets either under Site Crate or we get them under the contract. Sure. I think under... If the agreement is properly terminated for cause, then yes, the assets should be transferred to the district under the agreement. I think the Site Price issue comes into play, in particular if there's without cause termination. I think the district's argument is that it doesn't matter if it was for cause or without cause, the contract is amended so under Site Price that the assets should be transferred. I think that's a different issue than the contract itself. I don't think Site Price applies to the department in this case because unlike the Riverton Fire Department case, this department provides services other than solely the fire protection services. I don't have anything else, Your Honors, unless you have any other questions. Thank you very much. Thank you. Thank you both for your arguments here today. This matter will be taken under advisement and a written disposition will be issued in due course. Right now we'll be in a brief recess for a panel change before the next case.